IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA and | |
| THE STATE OF KANSAS, ex rel. KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT, | CIVIL ACTION NO.: 2:20-cv-2270 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| HOLLYFRONTIER EL DORADO REFINING LLC, | |
| Defendant. | |

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Kansas, by and through the Kansas Department of Health and Environment ("KDHE") (collectively "Plaintiffs"), allege the following:

**NATURE OF ACTION**

1.      This is a civil action brought by the United States against HollyFrontier El Dorado Refining LLC, f/k/a Frontier El Dorado Refining LLC, ("HollyFrontier"), under Sections 112(r) and 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7412(r) and 7413(b), for alleged environmental violations at the HollyFrontier Refinery ("Refinery") located in El Dorado, Kansas.

2.      This civil action is also being brought by the State of Kansas under the Kansas Air Quality Act ("KAQA"), Kan. Stat. Ann. § 65-3001 *et seq.*

3.      This Complaint alleges that HollyFrontier has violated and, in some instances, continues to violate, the following environmental statutes, regulations, and permits applicable to the petroleum refining industry:

(a)      the CAA, 42 U.S.C. § 7401 *et seq.*, specifically Section 110 of the CAA, 42 U.S.C. § 7410, and the Kansas State Implementation Plan ("SIP") issued thereunder; Section 111 of the CAA, 42 U.S.C. § 7411, and the New Source Performance Standards ("NSPS"), 40 C.F.R. Part 60; Section 112 of the CAA, 42 U.S.C. § 7412, and the National Emission Standards For Hazardous Air Pollutants ("NESHAPs"), 40 C.F.R. Part 63; Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1); and Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and the Risk Management Program, 40 C.F.R. Part 68;

(b)      the KAQA, Kan. Stat. Ann. § 65-3001 *et seq.*, and Kan. Admin. Regs. §§ 28-19-302, 28-19-650, and 28-19-20; and

(c)      the federally enforceable permits issued to HollyFrontier by KDHE pursuant to Title V of the CAA, 42 U.S.C. § 7661-7661f; the KAQA, Kan. Stat. Ann. § 65-3001 *et seq.*; and the regulations promulgated thereunder.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the CAA, 42 U.S.C. § 7413(b).  This Court has supplemental jurisdiction over the State law claims asserted by the State pursuant to 28 U.S.C. § 1367.

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

5.      Venue is proper in the District of Kansas pursuant to 28 U.S.C. §§ 1391(b), (c), and 1395(a), and Section 113(b) of the CAA, 42 U.S.C. § 7413(b), because the defendant resides in this judicial district and the violations alleged occurred in this district.

6.      Plaintiff, the United States, is acting at the request of EPA, an agency of the United States.

7.      Plaintiff, the State of Kansas is acting at the request of KDHE, an agency of the State of Kansas.

8.      Authority to bring this action is vested in the United States Department of Justice pursuant to Sections 113(b) and 305 of the CAA, 42 U.S.C. §§ 7413(b) and 7605; and pursuant to 28 U.S.C. §§ 516 and 519.

9.      Authority to bring this action is vested in KDHE pursuant to the KAQA, Kan. Stat. Ann. § 65-3018.

10.      Pursuant to Section 113(a)(1) of the CAA, as amended, 42 U.S.C. § 7413(a)(1), notice of the violations of the Kansas SIP that are alleged in this Complaint has been given to the State of Kansas and HollyFrontier at least 30 days prior to the filing of this Complaint.

## **DEFENDANT**

11.      HollyFrontier operates as a subsidiary of HollyFrontier Corporation, and is authorized to do business in Kansas.  HollyFrontier is engaged in the petroleum business, and owns or operates a refinery located in El Dorado, Kansas.

12.      Frontier El Dorado Refining Company ("Frontier El Dorado") and Frontier Refining Inc., entered into a Consent Decree with the United States and the State of Kansas on March 26, 2009 in the United States District Court for the District of Kansas in Civil Action No. 09-cv-1032 ("2009 Consent Decree").  A true and correct copy of the 2009 Consent Decree is

attached to this Complaint as "Exhibit A."  The 2009 Consent Decree focused on four marquee issues regarding compliance with the CAA, including: (1) New Source Review ("NSR")/Prevention of Significant Deterioration ("PSD"); (2) New Source Performance Standards ("NSPS"); (3) Leak Detection and Repair ("LDAR") Requirements; and (4) the National Emission Standard for Benzene Waste Operations ("Benzene Waste NESHAP").  The 2009 Consent Decree also addressed Frontier El Dorado's violations of Section 112(r)(7) of the CAA; the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); and Emergency Protection and Community Right-to-Know Act ("EPCRA") at the Refinery.

13.     On February 25, 2011, Frontier El Dorado paid stipulated penalties to the United States and to the State of Kansas for Frontier El Dorado's failure to comply with several provisions of the 2009 Consent Decree.  Specifically, Frontier El Dorado exceeded the Acid Gas/Tail Gas Flaring Incident requirements five times in a twelve-month rolling period.  2009 Consent Decree ¶ 75.  In addition, Frontier El Dorado violated the interim sulfur recovery plant operating parameter requirements during the maintenance turnaround.

14.     On July 25, 2012, Frontier El Dorado paid stipulated penalties to the United States and to the State of Kansas for Frontier El Dorado's failure to comply with several provisions of the 2009 Consent Decree.  Again, Frontier El Dorado exceeded the Acid Gas Flaring Incident requirements five times in a twelve-month rolling period.  2009 Consent Decree ¶ 75.  In addition, Frontier El Dorado violated the Benzene Waste NESHAP requirements of the 2009 Consent Decree.

15.     Pursuant to Paragraph 349 of the 2009 Consent Decree, for the violations alleged herein, the Plaintiffs elect to seek the assessment of civil penalties and appropriate injunctive relief in lieu of stipulated penalties under the 2009 Consent Decree.

## STATUTORY AND REGULATORY BACKGROUND

## Clean Air Act

16.     The CAA established a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

17.     Section 109 of the CAA, 42 U.S.C. § 7409, requires the EPA Administrator to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for certain criteria air pollutants.  The primary NAAQS are to be adequate to protect the public health, and the secondary NAAQS are to be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.  The Administrator has promulgated NAAQS for the criteria pollutants.

18.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a SIP that provides for the attainment and maintenance of the NAAQS.

19.     Under Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  These designations have been approved by EPA and are located at 40 C.F.R. Part 81.  An area that meets the NAAQS for a particular pollutant is classified as an "attainment"

area; one that does not is classified as a "non-attainment" area.  Kansas has a SIP that has been approved by EPA that accomplishes these goals and identifies attainment and non-attainment areas within the state.

## State Implementation Plan ("SIP")

20.     Section 110 of the CAA, 42 U.S.C. § 7410, grants the EPA Administrator authority to approve a SIP which provides for implementation, maintenance, and enforcement of an air quality standard in each air quality control region within the state.

21.     Section 161 of the CAA, 42 U.S.C. § 7471, requires SIPs to contain emissions limitations and other measures as may be necessary to prevent significant deterioration of air quality in attainment areas.  The SIP requirements are set forth in 40 C.F.R. Part 51.

22.     The Kansas Air Quality Regulations were adopted as part of the federally approved Kansas SIP.

23.     The Kansas SIP includes Kan. Admin. Regs. § 28-19-300 through Kan. Admin. Regs. § 28-19-304, titled "Construction Permits and Approvals," which set forth the general construction permit applicability and requirements.

24.     The regulations appearing at Kan. Admin. Regs. § 28-19-302, "Construction Permits and Approvals; Additional Provisions; Construction Permits" were incorporated into and part of the Kansas SIP at the time of the violations alleged in this Complaint.  EPA approved Kan. Admin. Regs. § 28-19-302 on July 17, 1995.  60 Fed. Reg. 36,361.

25.     Kan. Admin. Regs. § 28-19-302(a) states: "The owner or operator of any source which is required to obtain a construction permit pursuant to K.A.R. 28-19-16 through 28-19-16m, nonattainment area requirements, or K.A.R. 28-19-17 through 28-19-17q, prevention of

significant deterioration requirements, shall comply with any applicable construction permit requirements of the regulations in addition to the requirements set forth herein."

26.     The Kansas SIP includes Kan. Admin. Regs. § 28-19-650, titled "Emissions Opacity Limits," which set forth limits on the opacity of emission units.

27.     The regulations appearing at Kan. Admin. Regs. § 28-19-650, "Emissions Opacity Limits" were incorporated into and part of the Kansas SIP at the time of the violations alleged in this Complaint.  EPA approved Kan. Admin. Regs. § 28-19-650 on January 11, 2000.  65 Fed. Reg. 1545.

28.     Kan. Admin. Regs. § 28-19-650(a)(2) and (a)(3) state: "Except as otherwise provided in K.A.R. 28-19-9, K.A.R. 28-19-11, or K.A.R. 28-19-31, in subsections (b) and (c) of this regulation, or in other applicable air quality regulations, opacity of visible air emissions from any emission unit shall not exceed the following limits: . . . (2) 40 percent opacity for any emission unit, other than a portable source, that existed on or before January 1, 1971 and that has not been relocated after January 1, 1971; and (3) 20 percent opacity for any other emission unit."

29.     The Kansas SIP includes Kan. Admin. Regs. § 28-19-20, titled "Particulate Matter Emission Limitations," which set forth limits on particulate matter emissions.

30.     The regulations appearing at Kan. Admin. Regs. § 28-19-20, "Particulate Matter Emission Limitations" were incorporated into and part of the Kansas SIP at the time of the violation alleged in this Complaint.  EPA approved Kan. Admin. Regs. § 28-19-20 on January 16, 1990.  55 Fed. Reg. 1421.

31.     Kan. Admin. Regs. § 28-19-20(a) states: "Subject to the provisions of K.A.R. 28-19-9 and 28-19-11, no person shall cause, suffer, allow or permit the emission of particulate matter from any processing machine, equipment, device or other articles, or combination thereof,

excluding indirect heating equipment and incinerators, in excess of the amounts allowed in table P-1 during any one hour."

32.      Kan. Admin. Regs. § 28-19-20(b)(2) defines "process weight rate" to mean "the total process weight introduced into the source operation over a specific time period divided by that time period in hours."

**New Source Performance Standards ("NSPS")**

33.      Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires the EPA Administrator to publish a list of categories of stationary sources that emit or may emit any air pollutant.  The list must include any categories of sources which are determined to cause or significantly contribute to air pollution which may endanger public health or welfare.  EPA has identified petroleum refineries as one category of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare.

34.      Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires the EPA Administrator to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these categories.  These standards are codified at 40 C.F.R. Part 60 and referred to herein as "NSPS" or "NSPS regulations."

35.      "New Source" is defined as "any stationary source, the construction or modification of which is commenced after the publication of the [NSPS] regulations (or, if earlier, proposed regulations) prescribing a standard of performance . . . applicable to such source."  42 U.S.C. § 7411(a)(2).

36.     "Stationary Source" is defined as any "building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3).

37.     "Modification" is defined as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4).

38.     Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating any new (i.e., constructed or modified) source in violation of a NSPS after the effective date of the NSPS applicable to such source.

39.     Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA has promulgated the following NSPS Regulations that are relevant to this Complaint:

> NSPS general provisions applicable to all NSPS sources, which are codified at 40 C.F.R. Part 60, Subpart A ("NSPS Subpart A");
>
> NSPS for Equipment Leaks of VOC in Petroleum Refineries (between Jan. 4, 1983, and Nov. 7, 2006) Subpart GGG, 40 C.F.R. §§ 60.590 – 60.593; Equipment Leaks of VOC in Petroleum Refineries (after Nov. 7, 2006) Subpart GGGa, 40 C.F.R. §§ 60.590a – 60.593a;
>
> NSPS for Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (between Jan. 5, 1981, and Nov. 7, 2006) Subpart VV, 40 C.F.R. §§ 60.480 – 60.489; and Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (after Nov. 7, 2006) Subpart VVa, 40 C.F.R. §§ 60.480a – 60.489a;
>
> NSPS for Standards of Performance for VOC Emissions from Synthetic Organic Chemical Manufacturing Industry Distillation Operations, Subpart NNN, 40 C.F.R. §§ 60.660 – 60.668; and
>
> NSPS for Petroleum Refineries, which are codified at 40 C.F.R. Part 60, Subparts J and Ja, §§ 60.100-60.109 and §§ 60.100a-60.109a.

40.     Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart A, which are general NSPS regulations that apply to the owner or operator of any

stationary source which contains an "affected facility," the construction or modification of which is commenced after the publication of any NSPS (or, if earlier, the date of publication of any proposed standard) applicable to that facility.  40 C.F.R. § 60.1.

41.     "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

42.     Within NSPS Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment.  Specifically, at all times, including periods of startup, shutdown, and malfunction, "owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions."  40 C.F.R. § 60.11(d).

43.     Within NSPS Subpart A, EPA promulgated general control device and work practice requirements.  Specifically, 40 C.F.R. § 60.18(b) – (f) contains requirements for flares that are used as control devices for affected facilities subject to a NSPS.

44.     40 C.F.R. Part 60, Subpart VV (Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry) includes requirements for flares that are used as control devices for equipment leaks at affected facilities.  Specifically, 40 C.F.R. § 60.482-10(d) provides that flares must comply with 40 C.F.R. § 60.18 when used as control devices to comply with Subpart VV.

45.     40 C.F.R. Part 60, Subpart VVa (Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry) includes requirements for flares that are used as control devices for equipment leaks at affected facilities.  Specifically, 40 C.F.R. § 60.482-

10a(d) provides that flares must comply with 40 C.F.R. § 60.18 when used as control devices to comply with Subpart VVa.

46.     40 C.F.R. Part 60, Subpart GGG (Standards of Performance for Equipment Leaks of VOC in Petroleum Refineries) sets forth standards for equipment leaks of volatile organic compounds ("VOCs") at affected facilities in the petroleum refining industry.  Pursuant to 40 C.F.R. § 60.592(a), owners and operators of affected facilities subject to Subpart GGG are directed to comply with the requirements of 40 C.F.R. Part 60, Subpart VV, including 40 C.F.R. § 60.482-10 as set forth in Paragraph 44 above.

47.     40 C.F.R. Part 60, Subpart GGGa (Standards of Performance for Equipment Leaks of VOC in Petroleum Refineries) sets forth standards for equipment leaks of VOCs at affected facilities in the petroleum refining industry.  Pursuant to 40 C.F.R. § 60.592a(a), owners and operators of affected facilities subject to Subpart GGGa are directed to comply with the requirements of 40 C.F.R. Part 60, Subpart VVa, including 40 C.F.R. § 60.482-10a as set forth in Paragraph 45 above.

48.     Of relevance to this Complaint, Subparts GGG and GGGa apply to two types of affected facilities: (1) each compressor; and (2) all "equipment" within a process unit located at a petroleum refinery.  40 C.F.R. §§ 60.590(a), 60.590a(a).  "Equipment" means "each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service."  40 C.F.R. §§ 60.591, 60.591a.

49.     In all respects relevant to this Complaint, each owner or operator of a petroleum refinery that is subject to the requirements of Subparts GGG and GGGa is required to comply with the standards of Subparts VV and VVa, respectively.  40 C.F.R. §§ 60.592, 60.592a.

50.    Under Subparts VV and VVa – and therefore, under GGG and GGGa – each owner or operator who uses a flare as a control device to comply with the requirements of Subparts VV and VVa must also comply with the flare requirement in NSPS Subpart A: "Flares shall be designed for and operated with no visible emissions . . . except for periods not to exceed a total of 5 minutes during any 2 consecutive hours."  40 C.F.R. § 60.18(c)(1).

51.    In addition, affected facilities subject to Subparts GGG and GGGa – and therefore, subject to Subparts VV and VVa – must comply with 40 C.F.R. § 60.11(d).

52.    40 C.F.R. Part 60, Subpart NNN (Standards of Performance for VOC Emissions from Synthetic Organic Chemicals Manufacturing Industry Distillation Operations) provides that owners or operators who use flares to comply with Subpart NNN must combust the emissions in a flare that meets the requirements of 40 C.F.R. § 60.18.  40 C.F.R. § 60.662(b).

53.    Of relevance to this Complaint, any affected facility subject to Subpart NNN that uses a flare as the means of compliance must comply with the following requirement in NSPS Subpart A: "Flares shall be designed for and operated with no visible emissions . . . except for periods not to exceed a total of 5 minutes during any 2 consecutive hours."  40 C.F.R. § 60.18(c)(1).

54.    40 C.F.R. Part 60, Subpart J (Standards of Performance for Petroleum Refineries) applies to the following "affected facilities" at petroleum refineries: (a) any fluid catalytic cracking unit ("FCCU") catalyst regenerator or fuel gas combustion device ("FGCD") other than a flare that commences construction, reconstruction, or modification after June 11, 1973, and on or before May 14, 2007; (b) any FGCD that is also a flare that commences construction, reconstruction, or modification after June 11, 1973, and on or before June 24, 2008; and (c) any Claus sulfur recovery plant ("SRP") with a design capacity for sulfur feed of more than 20 long

tons per day that commences construction, reconstruction, or modification after October 4, 1976, and on or before May 14, 2007.  40 C.F.R. § 60.100(a)-(b).

55.     Each such FCCU catalyst regenerator, FGCD, and SRP located at a refinery that meets the conditions in Paragraph 54 is an "affected facility" subject to the requirements of NSPS Subpart J, 40 C.F.R. § 60.100 *et seq.*  40 C.F.R. § 60.100(a)–(b).

56.     Flares that combust fuel gas are "fuel gas combustion devices" within the meaning of NSPS Subpart J.  40 C.F.R. § 60.101(g).

57.     Under NSPS Subpart J, an owner or operator of a flare that is an affected facility is required to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of hydrogen sulfide ("$H_2S$") in the fuel gases before being burned in any flare.  40 C.F.R. § 60.105(a)(4).

58.     NSPS Subpart J prohibits an owner or operator of a flare that is an affected facility from burning any fuel gas in the flare that contains $H_2S$ in excess of 230 milligrams per dry standard cubic meter unless the fuel gas is released to the flare as a result of relief valve leakage or other emergency malfunction.  40 C.F.R. § 60.104(a)(1).

59.     40 C.F.R. Part 60 Subpart Ja, (Standards of Performance for Petroleum Refineries) applies to specified "affected facilities," at petroleum refineries, including, *inter alia*, flares, that commenced construction, modification, or reconstruction after June 24, 2008, and FCCUs, fluid coking units, FGCDs (including process heaters), and SRPs that commenced construction, modification, or reconstruction after May 14, 2007.  40 C.F.R. § 60.100a(a), (b).

60.     Each such flare, FGCD, and SRP located at a refinery that meets the conditions in Paragraph 59 is an "affected facility" subject to the requirements of NSPS Subpart Ja, 40 C.F.R. § 60.100a *et seq.*

61.     NSPS Subpart Ja, 40 C.F.R. § 60.101a, defines a "flare" as:

> a combustion device that uses an uncontrolled volume of air to burn gases. The flare includes the foundation, flare tip, structural support, burner, igniter, flare controls, including air injection or steam injection systems, flame arrestors and the flare gas header system. In the case of an interconnected flare gas header system, the flare includes each individual flare serviced by the interconnected flare gas header system and the interconnected flare gas header system.

62.     NSPS Subpart Ja, 40 C.F.R. § 60.101a, defines a "fuel gas combustion device" as, "any equipment, such as process heaters and boilers, used to combust fuel gas."

63.     NSPS Subpart Ja, 40 C.F.R. § 60.103a(f) and (h), prohibits owners and operators of flares subject to NSPS Ja from burning in any affected flare fuel gas containing $H_2S$ in excess of 162 parts per million by volume ("ppmv") determined hourly on a 3-hour rolling average basis.  Flares that have accepted applicability of Subpart J under a federal consent decree, shall comply with the 162 ppmv $H_2S$ standard set forth in 40 C.F.R. § 60.103a(h) no later than November 11, 2015.

64.     40 C.F.R. § 60.100a(c)(1) states a flare is modified when any new piping is physically connected to the flare.  40 C.F.R. § 60.100a(c)(2) states a flare is modified when a flare is physically altered to increase the flow capacity of the flare.

65.     40 C.F.R. § 60.103a(f) states in pertinent part "modified flares that have accepted applicability of subpart J under a federal consent decree shall comply with the subpart J requirements as specified in the consent decree, but shall comply with the requirements of paragraph (h) of this section and the requirements of § 60.107a(a)(2) by no later than November 11, 2015."

66.     The 2009 Consent Decree states that HollyFrontier shall comply with NSPS Subparts A and J requirements for each Hydrocarbon Flaring Device identified in Appendix G of

the 2009 Consent Decree by the Date of Entry of said 2009 Consent Decree.  2009 Consent Decree ¶ 65.

67.     The 2009 Consent Decree requires HollyFrontier, by no later than 120 days after the Date of Entry of the 2009 Consent Decree, to submit applications to the Applicable Intervenor to incorporate the emission limits and standards required by the 2009 Consent Decree that are effective as of the Date of Entry into federally enforceable minor or major new source review permits or other permits (other than CAA Title V permits).  Upon issuance of such permits, HollyFrontier shall file any applications necessary to incorporate the requirements of those permits into the CAA Title V permit for the Refinery.  2009 Consent Decree ¶ 207.

68.     The 2009 Consent Decree requires HollyFrontier, as soon as practicable, but in no event later than 90 days after the effective date or establishment of any emission limits and/or standards under Section VI (Affirmative Relief) of the 2009 Consent Decree, to submit applications to the Applicable Intervenor to incorporate the emission limits and/or standards into federally enforceable minor or major new source review permits or other permits (other than CAA Title V permits).  Upon issuance of such permits, HollyFrontier shall file any applications necessary to incorporate the requirements of those permits into the CAA Title V permit for the Refinery.  2009 Consent Decree ¶ 208.

### National Emission Standards for Hazardous Air Pollutants ("NESHAPs")

69.     Section 112 of the CAA sets forth a national program for the control of  hazardous air pollutants ("HAPs").  42 U.S.C. § 7412.  Under Section 112(b), Congress listed 188 HAPs believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

70.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

71.      "Major source" is defined as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  42 U.S.C. § 7412(a)(1).

72.      "Stationary source" is defined as "any building, structure, facility, or installation, which emits or may emit any air pollutant."  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)).

73.      A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31,576, 31,578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id.*

74.      Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(d)(1). These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

75.      To the extent that it is not feasible to prescribe or enforce an emission standard for the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work

practice, or operational" standards, consistent with the requirements for emission standards.

42 U.S.C. § 7412(h).

76.      The emission standards, limitations, and regulations (collectively called "emission

standards") promulgated under Section 112 of the 1990 Amendments of the CAA, 42 U.S.C.

§ 7412, are known as the NESHAPs for Source Categories or "MACT" ("maximum achievable

control technology") standards.  These emission standards are found in Part 63 of Title 40 of the

Code of Federal Regulations.

77.      After the compliance date of any emission standard promulgated pursuant to

Section 112 of the CAA, no person may operate a source in violation of an applicable NESHAP

regulation.  42 U.S.C. § 7412(i)(3).

78.      Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA has promulgated the

following NESHAP regulations that are relevant to this Complaint:

> NESHAP general provisions under Part 63, which are codified at 40 C.F.R. Part
> 63, Subpart A ("Part 63 NESHAP Subpart A");
>
> NESHAP applicable to petroleum refineries, which are codified at 40 C.F.R. Part
> 63, Subpart CC ("NESHAP Subpart CC"); and
>
> NESHAP applicable to catalytic cracking units, catalytic reforming units, and
> sulfur recovery units at petroleum refineries, which are codified at 40 C.F.R. Part
> 63 Subpart UUU ("NESHAP Subpart UUU").

79.      Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated Part 63

NESHAP Subpart A, which are general provisions applicable to all sources that are subject to the

NESHAP Regulations in 40 C.F.R. Part 63.  40 C.F.R. §§ 63.1-63.16.

80.      Under Part 63 NESHAP Subpart A, the provisions of 40 C.F.R. Part 63 "apply to

the owner or operator of any stationary source that- (i) [e]mits or has the potential to emit any

hazardous air pollutant listed in or pursuant to section 112(b) of the [CAA]; and (ii) [i]s subject

to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part."  40 C.F.R. § 63.1(b)(1)(i), (ii).

81.     Like NSPS Subpart A, Part 63 NESHAP Subpart A includes a requirement that owners and operators implement "good air pollution control practices" at all times, including periods of startup, shutdown, and malfunction.  40 C.F.R. § 63.6(e)(1)(i).  Under Part 63 NESHAP Subpart A, each relevant standard in 40 C.F.R. Part 63 must identify whether each provision in Part 63 NESHAP Subpart A is or is not included in such standard.  40 C.F.R. § 63.1(a)(4)(i).

82.     Within Part 63 NESHAP Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. § 63.11(b).

83.     Of relevance to this Complaint is the following requirement in Part 63 NESHAP Subpart A: flares shall be designed and operated with no visible emissions.  40 C.F.R. § 63.11(b)(4).

84.     Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified petroleum refineries as a source category of HAPs.  57 Fed. Reg. 31,576, 31,591 (Table 1) (July 16, 1992).

85.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries. 60 Fed. Reg. 43,244 (August 18, 1995).  These standards are commonly referred to as the "Refinery MACT" and are found at 40 C.F.R. Part 63, Subpart CC, §§ 63.640-63.656 and associated tables.

86.     Of relevance to this Complaint, the compliance date for affected sources subject to Subpart CC is August 18, 1998.  40 C.F.R. § 63.640(h)(2).

87.     Of relevance to this Complaint, the emission points subject to Subpart CC are all "miscellaneous process vents" and "equipment leaks" from petroleum refining process units that are: (1) located at a single refinery plant site that is a major source; and (2) that emit or have equipment containing or contacting one or more of the HAPs listed in a table associated with Subpart CC.  40 C.F.R. § 63.640(c)(1), (4).

88.     Under Subpart CC, owners or operators of certain types of process vents must reduce emissions of organic HAPs from these vents by using either: (1) a flare that meets the requirements of 40 C.F.R. § 63.11(b); or (2) a different type of control device that reduces organic HAPs by 98 weight percent or to a concentration of 20 ppmv.  40 C.F.R. § 63.643(a).

89.     Under Subpart CC, for equipment in organic HAP service, owners and operators must comply with the equipment leak provisions of 40 C.F.R. Part 60, Subpart VV, which requires compliance with 40 C.F.R. § 60.18.  40 C.F.R. § 63.648(a).

90.     Pursuant to 40 C.F.R. § 63.642(c), Table 6 of Subpart CC specifies the provisions of Subpart A of this part that apply and those that do not apply to owners and operators of sources subject to this subpart.

91.     Pursuant to Table 6 of Subpart CC, with certain exceptions that are not applicable here, owners or operators of affected facilities under Subpart CC are required to comply with 40 C.F.R. §§ 63.6(e) and 63.11(b).

92.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), and several years after promulgating Subpart CC, EPA promulgated Subpart UUU: the "National Emission Standards for Hazardous Air Pollutants for Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units."  These standards are commonly referred

to as the "Refinery MACT II" standards and are found at 40 C.F.R. Part 63, Subpart UUU, §§ 63.1560-1579 and associated tables.  67 Fed. Reg. 17,762 (April 11, 2002).

93.     Of relevance to this Complaint, the affected source that Subpart UUU applies to is each catalytic reforming unit that regenerates catalyst used in the unit, 40 C.F.R. § 63.1562(b)(2), that is located at a petroleum refinery that is a major source of HAP emissions. 40 C.F.R. § 63.1561(a).

94.     Of relevance to this Complaint, the compliance date for each existing catalytic reforming unit subject to Subpart UUU is April 11, 2005.  40 C.F.R. § 63.1563(b).

95.     Under Subpart UUU, owners or operators of process vents on catalytic reforming units that are affected sources have two compliance options for controlling emissions of organic HAPs, one of which requires venting emissions to a flare that meets the control device requirements of 40 C.F.R. § 63.11(b).  40 C.F.R. § 63.1566(a)(1)(i).

96.     Pursuant to 40 C.F.R. § 63.1577, Table 44 of Subpart UUU specifies the provisions of Subpart A of this part that apply and those that do not apply to owners and operators of sources subject to this subpart.

97.     Pursuant to Table 44 of Subpart UUU, owners and operators of affected facilities under Subpart UUU are required to comply with 40 C.F.R. §§ 63.6(e)(1) and 63.11(b).

## Title V

98.     Title V of the CAA, 42 U.S.C. §§ 7661-7661f, and the regulations promulgated thereunder (hereinafter "federal Title V Program and Regulations") establish an operating permit program for certain sources, including "major sources," that are subject to various CAA requirements including NSPS and NESHAP requirements, or any source required to have a PSD or Nonattainment NSR Permit.  42 U.S.C. § 7661a(a).  Under this operating permit program, all

"applicable requirements" that a source is subject to under the CAA, including SIP and NSPS requirements, are set forth in one operating permit known as a Title V permit.  42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a).

99.    Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

100.    EPA has approved the State of Kansas's Title V program, which is codified at Kan. Admin. Regs. § 28-19-500 *et seq*. (hereinafter "Kansas Title V Regulations").  66 Fed. Reg. 62,946, (Dec. 4, 2001).  Kansas is thereby authorized to issue and enforce Title V permits, which are referred to in Kansas regulations as operating permits.  In all respects relevant to this Complaint, the Kansas Title V Regulations closely mirror the federal Title V Program and Regulations codified at 40 C.F.R. Part 70.

101.    The federal Title V Program and Regulations and the Kansas Title V Regulations provide that no source subject to Title V may operate except in compliance with a Title V permit. 42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b), 70.7(b); Kan. Stat. Ann. § 65-3008; Kan. Admin. Regs. § 28-19-500.

102.    Section 503(c) of the CAA, 42 U.S.C. § 7661b(c), the implementing regulations at 40 C.F.R. § 70.5(a), and the Kansas Title V Regulations provide that each owner and operator of a source subject to Title V permitting requirements must submit a permit application.  Among other things, the permit application must contain: (i) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD and Nonattainment NSR programs and to

comply with the applicable NSPS and/or NESHAP/MACT standards), 40 C.F.R § 70.5(c)(4); (ii) information that may be necessary to determine the applicability of other CAA requirements, 40 C.F.R. § 70.5(c)(5); (iii) a compliance plan for all applicable requirements for which the source is not in compliance, 42 U.S.C. § 7661b(b); 40 C.F.R. § 70.5(c)(8); and (iv) a certification of compliance with all applicable requirements by a responsible official, 40 C.F.R. § 70.5(c)(9).

103.    Under 40 C.F.R. § 70.5(b) and the Kansas Title V Regulations, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

104.    Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Kansas Title V Regulations, require each Title V permit to include, *inter alia*, enforceable emission limitations and standards, a schedule of compliance, and such other conditions as are necessary to assure compliance with all applicable requirements of the CAA, including the requirements of the applicable SIP.

105.    The prohibitions against violating the terms of a Title V permit are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b), and Kan. Stat. Ann. § 65-3025.  All terms and conditions of a Title V permit are federally enforceable.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

### Kansas Air Quality Requirements

106.    The KAQA, Kan. Stat. Ann. § 65-3001 *et seq.*, establishes a regulatory scheme to promote air quality conservation and control of air pollution in the State of Kansas, the responsibility for which is placed with the Secretary of KDHE.  Kan. Stat. Ann. § 65-3003.  Kan. Stat. Ann. § 65-3005 authorizes the Secretary of KDHE to promulgate and implement rules and

regulations consistent with the purposes of the KAQA.  The air quality rules and regulations are published at Kan. Admin. Regs. § 28-19-1 *et seq.*

107.    Kan. Stat. Ann. § 65-3018 authorizes civil penalties of up to $10,000 per day for each violation of Kan. Stat. Ann. § 65-3025 and amendments thereto.  In the case of a continuing violation, every day such violation continues shall be deemed a separate violation.

108.    Kan. Stat. Ann. § 65-3011 authorizes KDHE, upon finding that any person has violated any provision of the KAQA, the regulations promulgated thereunder, or a permit issued thereunder, to order such person to take such action as necessary to correct the violation.

109.    Kan. Stat. Ann. § 65-3008b authorizes KDHE to suspend or revoke an approval or a permit if the permittee has violated any provision of the approval or the permit, any provision of the KAQA, or any rule and regulation adopted under the KAQA and applicable to the permitted source.

110.    NSPS Subparts A and J are adopted by the State of Kansas by reference at Kan. Admin. Regs. § 28-19-720.  Part 63 NESHAP Subpart CC is adopted by the State of Kansas by reference at Kan. Admin. Regs. § 28-19-750.

## **Accidental Release Prevention**

111.    In response to growing public concern and awareness of the threats posed by accidental releases of extremely hazardous substances, Congress amended the CAA in 1990 to include the accidental release provisions found in Section 112(r), 42 U.S.C. § 7412(r).  The objective of Section 112(r) of the CAA, 42 U.S.C. § 7412(r), is to prevent the accidental release of any extremely hazardous substance and to minimize the consequence of any such release.

## General Duty Clause

112.     Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), commonly referred to as the "General Duty Clause," is designed to impose a general duty on owners and operators to operate a safe facility free of accidental releases that threaten life or property by taking all feasible actions that are available to reduce hazards which are known to exist at the facility or which have been identified for similar facilities in the same industrial group.  S. Rep. No. 228, 101st Cong., 1st Sess. 208 (1989).

113.     Specifically, Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), sets forth that owners and operators of stationary sources producing, processing, handling, or storing substances listed pursuant to Section 112(r)(3), 42 U.S.C. § 7412(r)(3), or any other extremely hazardous substance, have a general duty in the same manner and to the same extent as under the Occupational Safety and Health Act, 29 U.S.C. § 654 *et seq*., to identify hazards which may result from accidental releases using appropriate hazard assessment techniques; to design and maintain a safe facility, taking such steps as are necessary to prevent releases; and to minimize the consequences of accidental releases which do occur.

114.     Pursuant to Section 112(r)(3), 42 U.S.C. § 7412(r)(3), EPA promulgated a list of extremely hazardous substances codified at 40 C.F.R. § 68.130.

115.     Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), and the regulations at 40 C.F.R. § 68.3, define "stationary source" as "any buildings, structures, equipment, installations or substance-emitting stationary activities which belong to the same industrial group, which are located on one or more contiguous properties, which are under the control of the same person (or persons under common control), and from which an accidental release may occur."

116.     Section 112(r)(2)(A) of the CAA, 42 U.S.C. § 7412(r)(2)(A), defines "accidental release" as "an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source."

**Risk Management Program**

117.     Section 112(r) of the Clean Air Act, 42 U.S.C. § 7412(r), requires the EPA Administrator to, among other things, promulgate regulations in order to prevent accidental releases of extremely hazardous substances.  Section 112(r) of the CAA, 42 U.S.C. § 7412(r), mandates the Administrator to promulgate a list of regulated substances, with threshold quantities, and defines the stationary sources that will be subject to the accident prevention regulations mandated by Section 112(r)(7).  Specifically, Section 112(r)(7), 42 U.S.C. § 7412(r)(7), requires the Administrator to promulgate regulations that address release prevention, detection, and correction requirements for these listed regulated substances.

118.     On June 20, 1986, EPA promulgated a final rule setting forth the Chemical Accident Prevention Provisions, commonly referred to as "the Risk Management Program," 40 C.F.R. Part 68, which implements Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7). This rule requires owners and operators of stationary sources to develop and implement a risk management program that includes a hazard assessment, a prevention program, and an emergency response program.  The risk management program is described in a risk management plan ("RMP") that must be submitted to EPA.

119.     The regulations at 40 C.F.R. § 68.10 set forth how the Chemical Accident Prevention Provisions apply to covered processes.  Under 40 C.F.R. § 68.10(a)(3), an owner or operator of a stationary source that has more than a threshold quantity of a regulated substance in a process, as determined pursuant to 40 C.F.R. § 68.115, shall comply with the requirements of

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

Part 68, no later than the date on which a regulated substance is first present above a threshold quantity in a process.  Pursuant to 40 C.F.R. § 68.10(d), a covered process is subject to Program 3 requirements if the process does not meet the eligibility requirements of Program 1, as described in 40 C.F.R. § 68.10(b), and it either falls under a specified North American Industry Classification System code or is subject to the Occupational Safety and Health Administration process safety management standard, 29 C.F.R. § 1910.119.

120.    40 C.F.R. § 68.3 defines "regulated substance" as any substance listed in 40 C.F.R. § 68.130, pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3).

121.    40 C.F.R. § 68.3 defines "threshold quantity" as the quantity specified for regulated substances pursuant to Section 112(r)(5) of the CAA, 42 U.S.C. § 7412(r)(5), listed in 40 C.F.R. § 68.130, and determined to be present at a stationary source as specified in 40 C.F.R. § 68.115.

122.    40 C.F.R. § 68.3 defines "process" as "any activity involving a regulated substance including any use, storage, manufacturing, handling or on-site movement of such substances, or combination of these activities.  For the purposes of this definition, any group of vessels that are interconnected, or separate vessels that are located such that a regulated substance could be involved in a potential release, shall be considered a single process."

## GENERAL ALLEGATIONS

123.    HollyFrontier is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), and the KAQA, Kan. Stat. Ann. §§ 65-3008, 65-3011, 65-3018, 65-3025, and applicable federal and state regulations promulgated pursuant to these statutes.

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

124.     HollyFrontier is the "owner or operator," within the meaning of the CAA, and the regulations promulgated and permits issued thereunder, of the Refinery located in El Dorado, Kansas.

125.     The Refinery is a "major emitting facility," a "source," a "stationary source," a "major stationary source," and a "major source" within the meaning of the CAA, the PSD and Minor NSR permit programs and regulations, the NSPS program and regulations, the NESHAP/MACT program and regulations, the Title V program and regulations, and the State SIP that adopts, incorporates and/or implements these programs and regulations.

126.     The Refinery is a "stationary source" as defined by Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), and 40 C.F.R. § 68.3.

## Clean Air Act

127.     On September 21, 2011, KDHE issued HollyFrontier an Air Emission Source Construction Permit (Source ID 0150004) ("Construction Permit") pursuant to Kan. Stat. Ann. § 65-3008, as amended.  This Construction Permit requires HollyFrontier to meet the emission limits and standards of the 2009 Consent Decree.

128.     The Refinery has a November 9, 2011, Title V permit ("Title V Permit") issued by the State of Kansas, in which the Refinery is located.  A true and correct copy of the Title V Permit is attached to this Complaint as "Exhibit B."

129.      HollyFrontier operates two steam-assisted flares at the Refinery.  The west flare (B1302) ("West Flare") is the main flare, while the east flare (B1303) ("East Flare") serves as a backup flare.

130.     A flare is a combustion device that uses an uncontrolled volume of ambient air to burn gases.

131.    A steam-assisted flare is a flare that utilizes steam piped to the flare tip to assist in combustion.

132.     Pursuant to Section 114 of the CAA, 42 U.S.C. § 7414, EPA sent Information Requests to HollyFrontier dated June 18, 2014, and March 2, 2016 (hereinafter "Section 114 Requests"), to determine compliance with the CAA.  HollyFrontier provided its responses to the Section 114 Requests on August 29, 2014, October 7, 2014, December 3, 2014, January 16, 2015, and April 6, 2016 (hereinafter "Section 114 Response").

## Accidental Release Prevention

### General Duty Clause and Risk Management Program

133.    The following substances are extremely hazardous substances and "regulated substances" pursuant to 40 C.F.R. § 68.3: Butane; Ethane; Isobutane [Propane, 2-methyl]; Pentane; Isopentane [Butane, 2-methyl-]; Propane; Methane; and Hydrogen.

134.    The threshold quantity for the extremely hazardous substances referenced in Paragraph 133, as listed in 40 C.F.R. § 68.130, is 10,000 pounds.

135.    On or about November 17, 2014 through November 21, 2014, an EPA representative conducted an inspection of the Refinery to determine HollyFrontier's compliance with Section 112(r) of the CAA and the regulations promulgated thereunder (hereinafter "EPA Inspection").  Specifically, the EPA Inspection reviewed two of the sixteen Refinery processes, including the FCCU process and the Gofiner process.

136.    Information gathered as a result of the EPA Inspection revealed that the extremely hazardous substances referenced in Paragraph 133, were produced, processed, handled, or stored at the Refinery.

137.    Information gathered as a result of the EPA Inspection revealed that the FCCU process had greater than 10,000 pounds of the following extremely hazardous substances: Ethane; Methane; Propane; Pentane; Isobutane [Propane, 2-methyl]; Isopentane [Butane, 2-methyl-]; and Butane.

138.    Information gathered as a result of the EPA Inspection revealed that the Gofiner process had greater than 10,000 pounds of the following extremely hazardous substances: Butane; Isobutane [Propane, 2-methyl]; Hydrogen; Isopentane [Butane, 2-methyl-]; Propane; Hydrogen Sulfide; Methane; Ethane; and Pentane.

139.    On or about September 4, 2017, heater tube 23 ruptured in the CRU2/HTU2 charge heater process due to creep, a molecular failure mechanism that causes metal deformation as a result of stress from high temperatures.  The rupture of heater tube 23 caused the release of a naphtha/hydrogen mixture into the heater box.  The naphtha/hydrogen mixture ignited, causing a fire and smoke to emanate from the heater stack (hereinafter the "Fire").  An outside operator, who was called by the board operator to investigate the "No Flame" alarm signaled from the control system, was engulfed by the emanating flames and died as a result of second and third degree burns over eighty percent of his body.

140.    On or about October 12, 2017, EPA issued another request for information to HollyFrontier, pursuant to Section 114 of the CAA, 42 U.S.C. § 7414, seeking specific information related to the Fire and the cause of the Fire.

141.    On or about November 13, 2017, November 20, 2017, and June 11, 2018, EPA received responses to the October 12, 2017 request for information.

142.    Information gathered as a result of the October 12, 2017 request for information revealed that the CRU2/HTU2 process had greater than 10,000 pounds of the following

extremely hazardous substances: Butane; Ethane; Isobutane [Propane, 2-methyl]; Pentane;

Isopentane [Butane, 2-methyl-]; and Propane.

143.    From the time HollyFrontier first produced, processed, handled, or stored any of

the extremely hazardous substances referenced in Paragraph 133, HollyFrontier was subject to

the requirements of Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

144.    From the time HollyFrontier first had on site greater than 10,000 pounds of the

extremely hazardous substances referenced in Paragraph 133 in a process, HollyFrontier was

subject to the requirements of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and 40

C.F.R. Part 68.

145.    From the time HollyFrontier first had on site greater than 10,000 pounds of the

extremely hazardous substances referenced in Paragraph 133 in a process, HollyFrontier was

subject to the Program 3 prevention program requirements because, pursuant to 40 C.F.R.

§ 68.10(d), the covered processes at the Refinery did not meet the eligibility requirements of

Program 1; HollyFrontier is subject to the Occupational Safety and Health Administration

process safety management standard, 29 C.F.R. § 1910.119; and HollyFrontier falls under a

specified North American Industry Classification System code, 324110 – Petroleum Refining.

146.    As a result of the EPA Inspection and the responses to the October 12, 2017

request for information (hereinafter collectively referred to as the "EPA Investigation"), EPA has

determined that violations of Section 112(r) of the CAA, 42 U.S.C. § 7412(r), and 40 C.F.R. Part

68 occurred at the Refinery.

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

## CLAIMS FOR RELIEF

## Clean Air Act

## First Claim for Relief

## Opacity Regulations (Kansas SIP) and Title V Permit

147.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

148.    At the time of the violations alleged in this Complaint, HollyFrontier's emission units were subject to the opacity regulations found at Kan. Admin. Regs. § 28-19-650(a)(3).

149.    HollyFrontier's West Flare is subject to a 20% opacity limit as set forth in Kan. Admin. Regs. § 28-19-650(a)(3), and Frontier El Dorado Refining Company's Class I Operating Permit renewed on November 9, 2011.  *See* Title V Permit at Section VII and IX.

150.    Information obtained by EPA shows HollyFrontier exceeded the 20% opacity limit at HollyFrontier's West Flare on numerous occasions, including, but not limited to, September 2, 2010; June 7, 2012; May 8, 2013; April 21, 2014; April 24-25, 2014; July 17, 2014; October 10, 2014; November 17, 2014; July 15, 2018; October 17, 2018; October 26, 2018; November 6, 2018; December 12, 2018; December 13, 2018; December 14, 2018; December 19, 2018; January 9, 2019; January 12, 2019; January 27, 2019; February 1, 2019; February 18, 2019; March 29, 2019; April 10, 2019; April 11, 2019; May 18, 2019; May 31, 2019; June 23, 2019; and June 24, 2019, in violation of Kan. Admin. Regs. § 28-19-650(a)(3) of the federally approved Kansas SIP, the CAA's implementing regulations, and HollyFrontier's Title V Permit.

151.    Unless restrained by an order of the Court, these violations of the CAA and the implementing regulations will continue.

152.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

153.    As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

## Second Claim for Relief

### Emissions of PM from FCCU in Excess of Limits in the Kansas SIP and Sections 110 and 113 of the CAA

154.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

155.    HollyFrontier's FCCU processes a petroleum feedstock and produces other products.  Accordingly, the FCCU is "processing equipment" under the SIP language and Kan. Admin. Regs. § 28-19-20 – Particulate matter emission limitations.

156.    Pursuant to Kan. Admin. Regs. § 28-19-20(a) and (b)(2), the PM emission limit in the SIP depends on the process weight rate (lbs./hour).

157.    HollyFrontier's estimates of the loss of FCCU catalyst on April 25, 2014, was approximately 6 to 9 tons of PM (i.e., approximately 500 lbs./hour PM emissions).

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

158.     HollyFrontier submitted petroleum feedstock rates in its Section 114 Response. Using the equation in Kan. Admin. Regs. § 28-19-20, HollyFrontier exceeded the PM SIP emission limit on April 25, 2014, in violation of Kan. Admin. Regs. § 28-19-20 of the federally approved Kansas SIP, and the CAA's implementing regulations.

159.     Unless restrained by an order of the Court, these violations of the CAA and the implementing regulations will continue.

160.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

161.     As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

## Third Claim for Relief

## Certain NSPS Requirements related to Flares and Title V Permit: Visible Emissions

162.     The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

163.     At all times relevant herein, HollyFrontier owns and operates "equipment" within the meaning of 40 C.F.R. §§ 60.590(a), 60.590a(a), 60.591, and 60.591a.  This equipment is an "affected facility" within the meaning of 40 C.F.R. § 60.2.

164.     This equipment is subject to the requirements of 40 C.F.R. Part 60, Subparts GGG and GGGa, and, by reference therein, to the requirements of 40 C.F.R. Part 60, Subpart VV and VVa.  This equipment also is subject to the requirements in HollyFrontier's Title V Permit that requires compliance with 40 C.F.R. Part 60, Subparts GGG, GGGa, VV, VVa, and NNN.  *See* Title V Permit at Att. E, pp. 28, 41, 43, 45, & 47.

165.     HollyFrontier uses the West Flare at the Refinery as a control device for compliance with the standards found at 40 C.F.R. Part 60, Subparts GGG, GGGa, and NNN.

166.     40 C.F.R. Part 60, Subparts GGG, GGGa, VV, VVa, and NNN require that flares used to control emissions must meet the requirements of 40 C.F.R. § 60.18; therefore, HollyFrontier's West Flare is subject to the requirements of 40 C.F.R. § 60.18(b)-(f).

167.     On numerous occasions, including but not limited to, September 2, 2010; May 8, 2013; January 13, 2014; April 21, 2014; April 24, 2014; April 25, 2014; July 17, 2014; October 10, 2014; November 17, 2014; September 10, 2016; March 27, 2017; March 28, 2017; July 18, 2017; July 21, 2017; July 15, 2018; October 17, 2018; October 26, 2018; November 6, 2018; December 12, 2018; December 13, 2018; December 14, 2018; December 19, 2018; January 9, 2019; January 12, 2019; January 27, 2019; February 1, 2019; February 18, 2019; March 29, 2019; April 10, 2019; April 11, 2019; May 18, 2019; May 31, 2019; June 23, 2019; and June 24, 2019 at the West Flare, HollyFrontier operated the flare with visible emissions in violation of 40 C.F.R. § 60.18(c)(1).  HollyFrontier failed to comply with the visible emissions requirements in HollyFrontier's Title V Permit.  *See* Title V Permit at Att. E, p. 37.

168.    HollyFrontier's failure to maintain compliance with the visible emissions requirements of the NSPS and Title V Permit violated Section 111 of the CAA, 42 U.S.C. § 7411; Section 111's implementing regulations at 40 C.F.R. § 60.18(c)(1) (prohibition on visible emissions in Subpart A of Part 60 (NSPS)); those provisions of HollyFrontier's Title V Permit that require compliance with 40 C.F.R. Part 60, Subpart A; and the prohibitions against violating the terms of a Title V permit.

169.    Unless restrained by an order of the Court, these violations of the CAA and the implementing regulations will continue.

170.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

171.    As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

### Fourth Claim for Relief

**Certain NESHAP Requirements related to Flares and Title V Permit: Visible Emissions**

172.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

173.    At all times relevant herein, HollyFrontier owns and operates "miscellaneous process vents" and "equipment leaks" within the meaning of 40 C.F.R. § 63.640(c)(1) and (4). These miscellaneous process vents and equipment leaks are located at a single refinery plant site, which is an "affected source" within the meaning of 40 C.F.R. § 63.2.

174.    These miscellaneous process vents and equipment leaks are subject to the requirements of 40 C.F.R. Part 63, Subpart CC.  In addition, these miscellaneous process vents and equipment leaks are subject to the requirements in HollyFrontier's Title V Permit that compels compliance with 40 C.F.R. Part 63, Subpart CC.  *See* Title V Permit at Att. E, p. 8.

175.    HollyFrontier owns and operates a catalytic reforming unit at the Refinery within the meaning of 40 C.F.R. § 63.1579.  The catalytic reforming unit is an "affected source" within the meaning of 40 C.F.R. § 63.2.

176.    The emissions from the catalytic reforming unit are subject to the requirements of 40 C.F.R. Part 63, Subpart UUU.  The emissions from the catalytic reforming unit also are subject to the requirements in HollyFrontier's Title V Permit that compels compliance with 40 C.F.R. Part 63, Subpart UUU.  *See* Title V Permit at Att. E, p. 3.

177.    HollyFrontier uses the West Flare at the Refinery as a control device for compliance with the standards found at 40 C.F.R. Part 63, Subparts CC and UUU.

178.    40 C.F.R. Part 63, Subparts CC and UUU require that flares used to control emissions must meet the requirements of 40 C.F.R. § 63.11; therefore, HollyFrontier's West Flare is subject to the requirements of 40 C.F.R. § 63.11(b).

179.    On numerous occasions, including but not limited to, September 2, 2010; May 8, 2013; January 13, 2014; April 21, 2014; April 24, 2014; April 25, 2014; July 17, 2014; October 10, 2014; November 17, 2014; September 10, 2016; March 27, 2017; March 28, 2017;

July 18, 2017; July 21, 2017; July 15, 2018; October 17, 2018; October 26, 2018; November 6,

2018; December 12, 2018; December 13, 2018; December 14, 2018; December 19, 2018;

January 9, 2019; January 12, 2019; January 27, 2019; February 1, 2019; February 18, 2019;

March 29, 2019; April 10, 2019; April 11, 2019; May 18, 2019; May 31, 2019; June 23, 2019;

and June 24, 2019 at the West Flare, HollyFrontier operated the flare with visible emissions in

violation of 40 C.F.R. § 63.11(b)(4).  HollyFrontier failed to comply with the visible emissions

requirements in HollyFrontier's Title V Permit.  *See* Title V Permit at Att. E, p. 37.

180.    HollyFrontier's failure to maintain compliance with the visible emissions

requirements of the NESHAP/MACT and Title V Permit violated Section 112 of the CAA,

42 U.S.C. § 7412; Section 112's implementing regulations at 40 C.F.R. § 63.11(b)(4)

(prohibition on visible emissions in Subpart A of Part 63 (NESHAP/MACT)); those provisions

of HollyFrontier's Title V Permit that require compliance with 40 C.F.R. Part 63, Subpart A; and

the prohibitions against violating the terms of a Title V permit.

181.    Unless restrained by an order of the Court, these violations of the CAA and the

implementing regulations will continue.

182.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the

assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA,

42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of

2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for

violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500

for violations occurring on or before November 2, 2015, and $101,439 per day per violation of

the CAA for violations occurring after November 2, 2015.

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

183.     As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

### Fifth Claim for Relief

### NSPS Subpart J Monitoring Requirement, Title V Permit, and Sections 111 and 113 of the CAA

184.     The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

185.     The 2009 Consent Decree states that HollyFrontier shall comply with NSPS Subparts A and J requirements for each Hydrocarbon Flaring Device identified in Appendix G of the 2009 Consent Decree by the Date of Entry of the 2009 Consent Decree.  *See* 2009 Consent Decree ¶ 65.

186.     HollyFrontier's West Flare is listed as a Hydrocarbon Flaring Device in Appendix G of the 2009 Consent Decree.

187.     The 2009 Consent Decree requires HollyFrontier to achieve compliance with NSPS Subparts A and J requirements for the West Flare through the use of one or any combination of the methods identified in Subparagraphs 65.a. - 65.e.  *See* 2009 Consent Decree ¶ 65.

188.     In its first semi-annual report due after the effective date of the 2009 Consent Decree, HollyFrontier chose to achieve compliance with NSPS Subpart J at the West Flare through the use of Subparagraph 65.a. ("Operating and maintaining a flare gas recovery system to prevent continuous or routine combustion in the Hydrocarbon Flaring Device") and Subparagraph 65.c. ("Operating the Hydrocarbon Flaring Device as a fuel gas combustion

device, monitoring it for the continuous or intermittent, routinely-generated refinery fuel gas streams put into the flare header").  *See* 2009 Consent Decree ¶ 65(a), (c).

189.     On numerous occasions, including, but not limited to, at least 32 days in 2010; 47 days in 2011; 48 days in 2012; 59 days in 2013; 61 days in 2014; and 27 days in 2015, HollyFrontier did not maintain the water seal at the flare gas recovery system, which allowed routinely generated fuel gas to be routed to the West Flare without continuous monitoring of the $H_2S$ concentration in the fuel gas being burned.

190.     Beginning as early as 2010 and including, but not limited to, the periods listed in Paragraph 189 above, HollyFrontier failed to continuously monitor the concentration of the $H_2S$ in the routinely generated fuel gas before being combusted in the West Flare as required by 40 C.F.R. § 60.105(a)(4).  HollyFrontier failed to comply with the monitoring requirements in HollyFrontier's Title V Permit.  *See* Title V Permit at Att. E, p. 38.

191.     HollyFrontier's failure to maintain compliance with the monitoring requirements of the NSPS and its Title V Permit violated Section 111 of the CAA, 42 U.S.C. § 7411; Section 111's implementing regulation at 40 C.F.R. § 60.105(a)(4); those provisions of HollyFrontier's Title V Permit that require compliance with 40 C.F.R. Part 60, Subpart J; and the prohibitions against violating the terms of a Title V permit.

192.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500

for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

193.    As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

## Sixth Claim for Relief

**NSPS Subpart J H$_2$S Fuel Gas Limit, Title V Permit, and Sections 111 and 113 of the CAA**

194.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

195.    The 2009 Consent Decree states that HollyFrontier shall comply with NSPS Subparts A and J requirements for each Hydrocarbon Flaring Device identified in Appendix G of the 2009 Consent Decree by the Date of Entry of the 2009 Consent Decree.  2009 Consent Decree ¶ 65.

196.    HollyFrontier's West Flare is listed as a Hydrocarbon Flaring Device in Appendix G of the 2009 Consent Decree.

197.    As of Date of Entry of the 2009 Consent Decree and continuing until November 11, 2015, HollyFrontier was required to comply with the NSPS Subpart J standard for H$_2$S in 40 C.F.R. § 60.104(a)(1) at the West Flare.

198.    40 C.F.R. § 60.104(a)(1) prohibits HollyFrontier from burning any fuel gas in the West Flare that contains H$_2$S in excess of 230 milligrams per dry standard cubic meter, unless the fuel gas is process upset gas or is released to the flare as a result of relief valve leakage or other emergency malfunction.

199.     On numerous occasions, including but not limited to August 30, 2010; October 4 -

October 9, 2010; November 1 - November 3, 2010; June 8, 2011; August 30 - September 1,

2011; March 26 - April 6, 2012; November 10, 2012; April 28 - May 21, 2013; September 11 -

September 17, 2014; November 12, 2014; January 8 - January 17, 2015; February 4 - February 9,

2015; April 7 - April 10, 2015; May 15 - May 16, 2015; June 8, 2015; June 13, 2015; and

October 2, 2015, HollyFrontier burned fuel gas in its West Flare that contained $H_2S$ in excess of

230 milligrams per dry standard cubic meter, under circumstances in which no exceptions to that

standard apply, in violation of 40 C.F.R. § 60.104(a)(1).  HollyFrontier failed to comply with the

fuel gas limit for $H_2S$ requirements in HollyFrontier's Title V Permit.  *See* Title V Permit at Att.

E, p. 38.

200.     HollyFrontier's failure to comply with the emissions limit for $H_2S$ violated

Sections 111 and 113 of the CAA, 42 U.S.C. § 7411 and § 7413; Section 111's implementing

regulations at 40 C.F.R. § 60.104(a)(1); those provisions of HollyFrontier's Title V Permit that

require compliance with 40 C.F.R. Part 60, Subpart J; and the prohibitions against violating the

terms of a Title V permit.

201.     Unless restrained by an order of the Court, these violations of the CAA and the

implementing regulations will occur again in the future.

202.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the

assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA,

42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of

2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for

violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

203.    As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

## Seventh Claim for Relief

**NSPS Subpart A: 40 C.F.R. § 60.11(d) related to Operating and Maintaining an Affected Facility Including Associated Air Pollution Control Equipment Under Circumstances that Did Not Represent Good Air Pollution Control Practices, Title V Permit, and Sections 111 and 113 of the CAA**

204.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

205.    HollyFrontier failed to maintain and operate at least one affected facility in a manner consistent with good air pollution control practice for minimizing emissions at the Refinery on numerous occasions including but not limited to August 30, 2010; September 2, 2010; September 15, 2010; November 10, 2012; April 28 - May 21, 2013; November 12, 2014, June 8, 2015; June 12, 2015; and June 13, 2015.

206.    HollyFrontier's failure to maintain and operate any affected facility in a manner consistent with good air pollution control practice for minimizing emissions violates Sections 111 and 113 of the CAA, 42 U.S.C. § 7411 and § 7413; Section 111's implementing regulations at 40 C.F.R. § 60.11(d); those provisions of HollyFrontier's Title V Permit that require compliance with 40 C.F.R. Part 60, Subpart A, and the prohibitions against violating the terms of a Title V permit.

207.    Unless restrained by an order of the Court, these violations of the CAA and the implementing regulations will occur again in the future.

208.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

209.    As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

### Eighth Claim for Relief

### NSPS Subpart Ja $H_2S$ Fuel Gas Limit and Sections 111 and 113 of the CAA

210.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

211.    Since November 11, 2015, NSPS Subpart Ja has prohibited HollyFrontier from burning in the West Flare any fuel gas that contains $H_2S$ in excess of 162 ppmv determined hourly on a 3-hour rolling average.  40 C.F.R. § 60.103a(h).

212.    40 C.F.R. § 60.103a(h) prohibits HollyFrontier from burning in the West Flare any fuel gas that contains $H_2S$ in excess of 162 ppmv determined hourly on a 3-hour rolling average, unless the fuel gas is process upset gas or is released to the flare as a result of relief valve leakage or other emergency malfunction.

213.     On numerous occasions, including but not limited to January 10, 2016;  February

12, 2016; May 5, 2016; May 24, 2016; July 3, 2016; July 27, 2016; September 19, 2016; October

1, 2016; October 19, 2016; October 20, 2016; November 11, 2016; December 17, 2016;

December 19, 2016; December 21, 2016; January 2, 2017; January 3, 2017; January 5, 2017;

January 10, 2017; March 15, 2017; May 31, 2017; June 14, 2017; June 24, 2017; July 16, 2017;

July 31, 2017; August 8, 2017; August 17, 2017; September 8, 2017; September 9, 2017;

November 28, 2017; December 23, 2017; July 3, 2018; July 9, 2018; July 13, 2018; July 31,

2018; August 1, 2018; August 8, 2018; August 13, 2018; August 14, 2018; August 15, 2018;

August 16, 2018; August 17, 2018; August 28, 2018; August 29, 2018; August 30, 2018;

September 5, 2018; December 3, 2018; and December 12, 2018, HollyFrontier burned fuel gas in

its West Flare that contained $H_2S$ in excess of 162 ppmv, under circumstances in which no

exceptions to that standard apply, in violation of 40 C.F.R. § 60.103a(h), and Section 111(e) of

the CAA, 42 U.S.C. § 7411(e).

214.     HollyFrontier's failure to comply with the emissions limit for $H_2S$ violated

Sections 111 and 113 of the CAA, 42 U.S.C. § 7411 and § 7413; and Section 111's

implementing regulations at 40 C.F.R. § 60.103a(h).

215.     Unless restrained by an order of the Court, these violations of the CAA and the

implementing regulations will occur again in the future.

216.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the

assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA,

42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of

2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for

violations of the CAA. The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

### Ninth Claim for Relief

**NSPS Ja NOx limit at Process Heater B-1002,
Title V Permit, and Sections 111 and 113 of the CAA**

217.     The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

218.     At all times relevant herein, HollyFrontier is the "owner or operator" of an affected "fuel gas combustion device (including process heaters)" within the meaning of 40 C.F.R. § 60.101a, and is required to comply with the emissions limits in paragraphs 40 C.F.R. § 60.102a(g)(1) and (2). 40 C.F.R. § 60.102a(g).

219.     The Process Heater B-1002 ("Gofiner Fractionator Heater") at the Refinery is subject to NSPS Subpart Ja. *See* Title V Permit at Att. E, p. 9.

220.     NSPS Subpart Ja requires owners or operators of process heaters subject to the nitrogen oxide ("NOx") emissions limits in 40 C.F.R. § 60.102a(g)(2), to "not discharge to the atmosphere any emissions of NOx in excess of the applicable limits in paragraphs (g)(2)(i) through (iv) of this section."

221.     The Process Heater B-1002 at the Refinery emitted into the atmosphere gases containing in excess of the NOx emissions limit from December 18, 2016 to January 21, 2017, in violation of 40 C.F.R. § 60.102a(g)(2)(ii)(B) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

222.     HollyFrontier's failure to comply with the NOx emission limit violated Sections 111 and 113 of the CAA, 42 U.S.C. § 7411 and § 7413; Section 111's implementing regulations

at 40 C.F.R. § 60.102a(g)(2)(ii)(B); those provisions of HollyFrontier's Title V Permit that require compliance with 40 C.F.R. Part 60, Subpart Ja; and the prohibitions against violating the terms of a Title V permit.

223.    Unless restrained by an order of the Court, these violations of the CAA and the implementing regulations will occur again in the future.

224.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

225.    As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

## Tenth Claim for Relief

### NSPS Ja at Sulfur Recovery Plant and Title V Permit

226.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

227.    At all times relevant herein, HollyFrontier is the "owner or operator" of a SRP, within the meaning of 40 C.F.R. § 60.101a and is an "affected facility" within the meaning of 40 C.F.R. § 60.2.  The SRP at the Refinery includes, but is not limited to, two sulfur recovery

units, two sulfur pits, a tail gas unit, and one tail gas incinerator, and has a design production capacity greater than 20 long tons of sulfur per day.

228.    On March 15, 2011, KDHE issued permit C-9309 to HollyFrontier to incorporate the requirements of NSPS Subpart Ja, to which the SRP becomes subject after startup of the oxygen enrichment project.  The SRP at the Refinery became subject to NSPS Subpart Ja upon startup of this project.

229.    NSPS Subpart Ja, 40 C.F.R. § 60.102a(f)(1)(i), requires owners or operators of a SRP with an oxidation control system or a reduction control system followed by incineration, to "not discharge or cause the discharge of any gases containing $SO_2$ [sulfur dioxide] into the atmosphere  in excess of the emission limit calculated using Equation 1 of this section."

230.    The SRP at the Refinery is subject to the emission limit calculated using Equation 1 set forth in 40 C.F.R. § 60.102a(f)(1)(i).

231.    From the SRP, HollyFrontier emitted into the atmosphere gases containing in excess of the $SO_2$ emission limit as calculated using Equation 1 on May 1 - May 9, 2017; January 27, 2019; February 1, 2019; February 3, 2019; March 17, 2019; March 21, 2019; and March 25 - June 30, 2019, in violation of 40 C.F.R. § 60.102a(f)(1)(i) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).  HollyFrontier failed to comply with the SRP emission limit in HollyFrontier's Title V Permit.  *See* Title V Permit at Att. E, p. 5.

232.    HollyFrontier's failure to comply with the SRP emission limit violated Section 111 of the CAA, 42 U.S.C. § 7411; Section 111's implementing regulations at 40 C.F.R. § 60.102a(f)(1)(i); those provisions of HollyFrontier's Title V Permit that require compliance with 40 C.F.R. Part 60, Subpart Ja; and the prohibitions against violating the terms of a Title V permit.

233.     Unless restrained by an order of the Court, these violations of the CAA and the implementing regulations will occur again in the future.

234.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

235.     As a result of the above-listed violations, pursuant to Kan. Stat. Ann. § 65-3018, HollyFrontier is liable for the assessment of civil penalties to the State of Kansas of not more than $10,000 per day for each violation.

## Chemical Safety and Reporting

### Eleventh Claim for Relief

#### General Duty Clause

236.     The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

237.     Pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), the owner or operator of a stationary source producing, processing, handling, or storing an extremely hazardous substance has a general duty to design and maintain a safe facility taking such steps as are necessary to prevent releases.

238.     Information gathered as a result of the EPA Investigation demonstrated that HollyFrontier had knowledge, through process safety information, operational history, and industry guidance and standards, that creep can occur at a more rapid pace when heater tubes are exposed to process temperatures above safe design operating limits, which may cause tube failure.

239.     Information gathered as a result of the EPA Investigation revealed that HollyFrontier took steps, in its design and maintenance of the CRU/HTU2 process, to increase the risk for a release to occur.  Specifically, HollyFrontier altered the design of the CRU/HTU2 process, in order to increase capacity, by increasing the process temperature, and continued to maintain the process at temperatures exceeding safe design operating limits.

240.     On September 4, 2017, tube 23 failed as a result of creep, causing the release of the naphtha/hydrogen mixture, an extremely hazardous substance.

241.     HollyFrontier took steps to exacerbate the risk for creep to occur, rather than taking necessary steps to design and maintain a safe facility to prevent releases, as required by the General Duty Clause.

242.     HollyFrontier's failure to design and maintain a safe facility, including but not limited to taking such steps as were necessary to prevent the September 4, 2017 catastrophic release and resulting fire, is a violation of Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

243.     As a result of violations, including, but not limited to, the above-listed violation, and pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4

establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

## Twelfth Claim for Relief

### Risk Management Program Mechanical Integrity Equipment Deficiencies

244.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

245.    40 C.F.R. § 68.12(d)(3) requires the owner or operator of a stationary source with a process subject to Program 3 to implement the prevention requirements of 40 C.F.R. §§ 68.65 through 68.87.

246.    40 C.F.R. § 68.73(e) requires that the "owner or operator shall correct deficiencies in equipment that are outside acceptable limits (defined by the process safety information in [40 C.F.R.] § 68.65) before further use or in a safe and timely manner when necessary means are taken to assure safe operation."

### *Temperature Deficiency*

247.    HollyFrontier's process safety information collected as a result of the EPA Investigation included process safe upper limits for temperatures for the heater tubes in the CRU/HTU2 process.

248.    HollyFrontier's mechanical integrity temperature testing data collected as a result of the EPA Investigation revealed that equipment in the CRU/HTU2 process, namely the heater tubes, repeatedly exceeded the safe upper limits defined by the process safety information.

249.    Information gathered as a result of the EPA Investigation demonstrated that necessary means were not taken by HollyFrontier to correct the deficient temperature

exceedances in order to assure safe operation.  HollyFrontier continued to use the heater tubes until the Fire.

250.    HollyFrontier's failure to correct heater tube temperatures exceeding safe operating limits, as defined by HollyFrontier's process safety information, when necessary means needed to be taken to assure safe operation, as required by 40 C.F.R. § 68.73(e), pursuant to 40 C.F.R. § 68.12(d)(3), is a violation of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

*Life Span Deficiency*

251.    HollyFrontier's process safety information collected as a result of the EPA Investigation included life span information for the heater tubes in the CRU/HTU2 process.

252.    HollyFrontier's mechanical integrity inspection information collected as a result of the EPA Investigation revealed recommendations that the heater tubes be replaced by a date certain prior to the Fire.

253.    HollyFrontier's process safety information and industry standards recommend including a "creep factor" when calculating the remaining life of a heater tube, noting that stress from increased heat above safe operating limits significantly reduces the life span of heater tubes.

254.    Information gathered as a result of the EPA Investigation demonstrated that despite HollyFrontier's knowledge of increased heat significantly reducing the life span of heater tubes and recommendations to replace the heater tubes, only approximately ten percent of the heater tubes had been replaced at the time of the Fire, not including heater tube 23.

255.    HollyFrontier's failure to replace heater tubes exceeding safe life span expectancies, as defined by HollyFrontier's process safety information, when necessary means

needed to be taken to assure safe operation, as required by 40 C.F.R. § 68.73(e), pursuant to 40 C.F.R. § 68.12(d)(3), is a violation of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

256.     As a result of violations, including but not limited to those listed above and pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

## Thirteenth Claim for Relief

## Risk Management Program Mechanical Integrity Inspections and Testing

257.     The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

258.     40 C.F.R. § 68.12(d)(3) requires the owner or operator of a stationary source with a process subject to Program 3 to implement the prevention requirements of 40 C.F.R. §§ 68.65 through 68.87.

259.     40 C.F.R. § 68.73(d)(1) requires that inspections and tests shall be performed on process equipment.

260.     40 C.F.R. § 68.73(d)(3) requires that the frequency of inspections and tests of process equipment shall be consistent with applicable manufacturers' recommendations and good engineering practices, and shall occur more frequently if determined necessary by prior operating experience.

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

*Heater Tubes*

261.    HollyFrontier's mechanical integrity inspection rules, collected as part of the EPA Investigation, and industry standards direct that heater tubes should be inspected for evidence of overheating and increase in temperatures.

262.    HollyFrontier's inspection data, collected as part of the EPA Investigation, revealed that temperature testing was conducted on only approximately fifty percent of the heater tubes in the CRU/HTU2 process between January 9, 2015 and June 29, 2017, not including heater tube 23.

263.    HollyFrontier's mechanical integrity inspection rules, collected as part of the EPA Investigation, also directed HollyFrontier to increase the frequency of temperature testing if the results revealed readings with temperatures exceeding safe upper limits.

264.    HollyFrontier's data, collected as part of the EPA Investigation, revealed that the frequency of temperature testing was not increased as directed by HollyFrontier's mechanical integrity inspection rules.  On at least four testing intervals, when readings indicated heater tube temperatures exceeding safe upper limits, the subsequent temperature testing was not conducted at the frequency directed by HollyFrontier's mechanical integrity inspection rules.  From these four testing intervals, approximately forty-nine readings indicated temperatures exceeding safe upper limits.

265.    HollyFrontier's failure to perform inspections and tests on approximately fifty percent of the heater tubes in the CRU/HTU2 process, as required by 40 C.F.R. § 68.73(d)(3), and HollyFrontier's failure to perform the inspections at a frequency consistent with good engineering practices determined by HollyFrontier's mechanical integrity rules and prior

operating experience, as required by 40 C.F.R. § 68.73(d)(3), pursuant to 40 C.F.R.

§ 68.12(d)(3), is a violation of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

*Piping*

266.     HollyFrontier's mechanical integrity inspection rules, collected as part of the EPA

Investigation, and industry standards recommend testing above-ground piping systems at

maximum intervals ranging from five to ten years.

267.     HollyFrontier's mechanical integrity inspection records, collected as part of the

EPA Investigation, revealed that at least three above-ground piping systems at the Refinery were

inspected at intervals of over thirty years.

268.     HollyFrontier's mechanical integrity inspection rules, collected as part of the EPA

Investigation, recommend testing below-ground piping systems at maximum intervals ranging

from five to ten years and industry standards recommend testing below-ground piping systems at

maximum intervals ranging from five to fifteen years.

269.     HollyFrontier's mechanical integrity inspection records, collected as part of the

EPA Investigation, revealed that a below-ground piping system at the Refinery was installed in

1982 and not inspected until 2013, a range of thirty-one years.

270.     HollyFrontier's failure to perform inspections and tests of the above-ground and

below-ground piping systems at a frequency consistent with good engineering practices as

determined by HollyFrontier's mechanical integrity rules, prior operating experience, and

industry's recommended standards, as required by 40 C.F.R. § 68.73(d)(3), pursuant to 40 C.F.R.

§ 68.12(d)(3), is a violation of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

271.     As a result of violations, including, but not limited to, those listed above, and

pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a

permanent or temporary injunction and/or the assessment of civil penalties for each violation of

the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4

establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per

day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015,

and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

## Fourteenth Claim for Relief

### Risk Management Program: Program 3 Prevention Requirements

272.　　The allegations in Paragraphs 1 through 146 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

273.　　40 C.F.R. § 68.12(d)(3) requires the owner or operator of a stationary source with

a process subject to Program 3 to implement the prevention requirements of 40 C.F.R. §§ 68.65

through 68.87.

274.　　The EPA Investigation revealed that HollyFrontier failed to implement numerous

Program 3 prevention requirements found in 40 C.F.R. §§ 68.65 through 68.87, specifically:

　　　　(a)　　Process Safety Information

　　　　　　　i.　40 C.F.R. § 68.65 requires that the owner or operator shall complete a

　　　　　　　　　compilation of written process safety information before conducting

　　　　　　　　　any process hazard analysis required by 40 C.F.R. Part 68, which shall

　　　　　　　　　include information related to the equipment in the process including,

　　　　　　　　　materials of construction and design codes and standards, and shall

　　　　　　　　　document that the equipment complies with recognized and generally

　　　　　　　　　accepted good engineering practices.

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

    ii. Documentation collected as a result of the EPA Investigation revealed that HollyFrontier failed to complete a compilation of written process safety information that included materials of construction and design codes and standards for pressure vessel equipment and failed to document that the pressure vessel equipment complies with recognized and generally accepted good engineering practices, as required by 40 C.F.R. § 68.65.

(b)    Process Hazard Analysis

    i. 40 C.F.R. § 68.67(c) and (e) require that the owner or operator shall perform a process hazard analysis that addresses the hazards of the process and shall establish a system to promptly address the team's findings and recommendations; assure that the recommendations are resolved in a timely manner and that the resolution is documented; document what actions are to be taken; complete actions as soon as possible; develop a written schedule of when these actions are to be completed; and communicate the actions to operating and maintenance and other employees whose work assignments are in process and who may be affected by the recommendations or actions.

    ii. Documentation collected as a result of the EPA Investigation revealed that HollyFrontier failed to address the hazards associated with a process power loss in the process hazard analysis and failed to assure that the process hazard analysis findings and recommendations were resolved in a timely manner, assure that the resolutions were

documented, and document what actions were to be taken, as required by 40 C.F.R. § 68.67(c) and (e).

(c)     Standard Operating Procedures

    i.   40 C.F.R. § 68.69(a) requires that the owner or operator develop and implement written operating procedures (commonly referred to as "standard operating procedures" or "SOPs") that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information, and address the elements provided in 40 C.F.R. § 68.69(a)(1)-(4).

    ii.  Documentation collected as a result of the EPA Investigation revealed that HollyFrontier failed to develop and implement SOPs that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information, as required by 40 C.F.R. § 68.69(a).  Specifically, HollyFrontier's SOPs reference valves no longer in service, fail to consistently utilize unique identifiers or designators for process equipment, and do not include procedures for lining up the Main Seal Tank.  HollyFrontier's failure to develop clear SOPs resulted in process upsets and a release of catalyst into the community.

(d)     Management of Change

    i.   40 C.F.R. §§ 68.75(e) and 68.77(b)(2) require the owner or operator to update operating procedures when a significant change or modification is made to the process that results in a change in the operating

procedures or practices, as required by 40 C.F.R. § 68.69, prior to the introduction of a regulated substance into the process.

ii. Documentation collected as a result of the EPA Investigation revealed that HollyFrontier failed to update written operating procedures, prior to the introduction of a regulated substance into the CRU2/HTU2 process, and after a modification was made to the gas delivery system in the CRU2/HTU2 process that resulted in a change in operating procedures, as required by 40 C.F.R. §§ 68.75(e) and 68.77(b)(2).

(e)     Compliance Audit

i. 40 C.F.R. § 68.79(a) and (d) require that the owner or operator shall certify that they have evaluated compliance with the provisions of Subpart D – Program 3 Prevention Program – (commonly referred to as "the compliance audit") at least every three years to verify that procedures and practices developed under Subpart D are adequate and are being followed and shall promptly determine and document an appropriate response to each of the findings of the compliance audit, and document that deficiencies have been corrected.

ii. Documentation collected as a result of the EPA Investigation revealed that HollyFrontier: (a) failed to complete a compliance audit for each process at the Facility at least every three years, including the CRU/HTU2 process; (b) failed to promptly determine and document an appropriate response to each compliance audit finding; and

(c) failed to document that deficiencies were corrected, as required by 40 C.F.R. § 68.79(a) and (d).

(f)    Incident Investigation

i.   40 C.F.R. § 68.81(a), (d), and (e) require that the owner or operator shall investigate each incident which resulted in, or could reasonably have resulted in a catastrophic release of a regulated substance; prepare a report at the conclusion of the investigation; establish a system to promptly address and resolve incident report findings and recommendations; and document resolutions and corrective actions.

ii.   Documentation collected as a result of the EPA Investigation revealed that after the Fire and the catastrophic release of the naphtha/hydrogen mixture, HollyFrontier failed to establish a system to promptly address and resolve incident report findings and recommendations and failed to document resolutions and corrective actions taken, as required by 40 C.F.R. § 68.81(a), (d), and (e).

275.    HollyFrontier's failure to comply with the Program 3 prevention requirements of 40 C.F.R. §§ 68.65 through 68.67, including, but not limited to, those documented above, pursuant to 40 C.F.R. § 68.12(d)(3), is a violation of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

276.    As a result of the violations, including, but not limited to, those listed above, and pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

**Fifteenth Claim for Relief**

**Risk Management Program: Emergency Response Program**

277.    The allegations in Paragraphs 1 through 146 are hereby re-alleged and incorporated by reference as if fully set forth herein.

278.    40 C.F.R. § 68.12(d)(5) requires the owner or operator of a stationary source with a process subject to Program 3 to develop and implement an emergency response program as provided in 40 C.F.R. §§ 68.90 – 68.95.

279.    40 C.F.R. § 68.95(a)(1)(ii) requires that the owner or operator shall develop and implement an emergency response program that includes an emergency response plan, which shall be maintained at the stationary source, that contains documentation of proper first-aid and emergency medical treatment necessary to treat accidental human exposure.

280.    HollyFrontier's emergency response plan, collected as part of the EPA Investigation, failed to contain documentation of proper first-aid and emergency medical treatment necessary to treat accidental human exposure.

281.    HollyFrontier's failure to develop and implement an emergency response program that includes an emergency response plan that contains documentation of proper first-aid and emergency medical treatment necessary to treat accidental human exposure, as required by 40 C.F.R. § 68.95(a)(1)(ii), pursuant to 40 C.F.R. § 68.12(d)(5), is a violation of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

282.     As a result of the violations, including, but not limited to, the violation listed above, and pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), HollyFrontier is liable for a permanent or temporary injunction and/or the assessment of civil penalties for each violation of the CAA.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CAA.  The maximum civil penalty per day per violation of the CAA is $37,500 for violations occurring on or before November 2, 2015, and $101,439 per day per violation of the CAA for violations occurring after November 2, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Order HollyFrontier to immediately comply with the statutory, regulatory, and permit requirements cited in this Complaint under the CAA;

2.     Order HollyFrontier to take appropriate measures to mitigate the effects of its violations;

3.     Assess civil penalties against HollyFrontier for up to the maximum amounts provided in the applicable statutes;

4.     Award Plaintiffs their costs and expenses incurred in this action; and

5.     Grant such other and further relief as may be just and proper and as the public interest and the equities of the case may require.

Respectfully submitted,

FOR THE UNITED STATES

NATHANIEL DOUGLAS
Deputy Section Chief

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

s/ Katherine L.  Matthews
KATHERINE L.  MATTHEWS
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
999 18th Street, South Terrace – Suite 370
Denver, CO 80202
(303) 844-1365
Kate.Matthews@usdoj.gov
Colorado Bar Number 53372

s/ Genevieve S. Parshalle
GENEVIEVE S. PARSHALLE
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
150 M Street NE
Washington, DC 20002
(202) 514-2445
Genevieve.Parshalle@usdoj.gov
California Bar Number 307228

STEPHEN R. MCALLISTER
United States Attorney
District of Kansas

s/ Emily Metzger
EMILY METZGER
Assistant United States Attorney
301 North Main Street, Suite 1200
Wichita, KS 67202
(316) 269-6481
Emily.Metzger@usdoj.gov
Kansas Supreme Court Number 10750

OF COUNSEL:
JULIE L. MURRAY
Assistant Regional Counsel
United States Environmental Protection Agency, Region 7
11201 Renner Boulevard
Lenexa, KS 66219

*In the matter of HOLLYFRONTIER EL DORADO REFINING LLC*

CLARISSA HOWLEY MILLS
Assistant Regional Counsel
United States Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500
Dallas, TX 75270

FOR THE STATE OF KANSAS

s/ Kate J. Gleeson
KATE J. GLEESON
Senior Environmental Attorney
Special Assistant Attorney General
Kansas Department of Health and Environment
1000 S.W. Jackson, Suite 560
Topeka, KS 66612
(785) 296-1607
(785) 559-4272 (fax)
kate.gleeson@ks.gov
Kansas Supreme Court Number 25518